No. 47,395

Joyce L. Kirby, widow and next of kin of Doyle Kirby, Deceased, and William E. Gallentine, Administrator of the Estate of Doyle Kirby, Deceased, *Appellants,* v. John Golden and Dick Golden, d/b/a Golden Wheat Ranch, *Appellees.*

(527 P. 2d 962)

Opinion filed November 2, 1974.

*Elmo Lund,* of Oberlin, argued the cause, and *Don C. Smith,* of Dodge City, was with him on the brief for the appellants.

*Raymond L. Dahlberg,* of Turner, Chartered, of Great Bend, argued the cause, and *Lee Turner,* of the same firm, and *Selby Soward,* of Goodland, were with him on the brief for the appellees.

The opinion of the court was delivered by

Harman, C.: These are consolidated tort actions arising out of a farm accident wherein a farm laborer was killed, one by the administrator of his estate for damages for personal injuries and the other by his widow for damages for wrongful death.

Trial to a jury resulted in a general verdict in the personal injury action for the administrator for $5,341.54, which was the exact amount of the agreed medical expenses plus two weeks' wages. Apparently no allowance was made for conscious pain and suffering sustained by the decedent prior to his death. In the wrongful death action the jury returned a general verdict for defendants.

In posttrial rulings the trial court denied the widow's request for new trial in the wrongful death action (none was made in the administrator's case) and it sustained defendants' motion in both actions for judgment notwithstanding the verdicts. The bases for these rulings were that there was no negligence shown on the

part of the defendants, no showing that defendants' actions contributed to plaintiffs' damage, and further that decedent had assumed the risk and was guilty of contributory negligence as a matter of law. Plaintiffs have appealed from these rulings. We should note in passing the record on appeal does not include any formal journal entry of judgment. The record does show that in announcing its rulings orally the court commented there was no evidence the decedent ever quit or was discharged following his injury and prior to his death and the defendants were indebted for two weeks' pay and the costs would be charged to the defendants. This inconsistency was not clarified at oral argument; however, defendants have not cross-appealed and we are not concerned with this aspect of the case.

The evidence at trial was largely uncontroverted and revealed the following: The defendant-appellees John Golden and Dick Golden were engaged in large scale farming in Sherman county, which operation included extensive irrigation. The decedent, Doyle Kirby, twenty-one years of age, was employed by them as a general farm laborer at a wage of $300.00 per month and use of a residence.

On the morning in question, August 11, 1971, appellees' foreman, Art Kibel, had told the decedent and several other farm employees they were to set or change irrigation water and move irrigation pipes. After giving these instructions the foreman went to town. The job, which involved going from field to field, was one the employees had done many times. That particular day the employees used an International Scout motor vehicle for transportation from one field to another. Another vehicle which had been used as well for transportation on prior occasions was disabled. The employees completed setting the water on the last well and started to another field down the road to move pipe. The employees were Doyle Kirby, the decedent, Jim Baltzell, John Griesty, and Jim and Stan Kibel, sons of the foreman. Stan Kibel was fourteen years of age. He did not have a driver's license or permit and had never taken driver education. On previous occasions he had driven the International Scout. Appellees had known of this driving but had made no objection. Stan was a good driver and had always been careful in his driving.

At the time in question Stan occupied the driver's seat and drove the vehicle. Griesty was seated on the right hand side inside the Scout. Jim Kibel was sitting on top of the cab with his feet hanging

down on the passenger's side. Without a word being said by anyone Baltzell hopped on the bumper on the right rear of the vehicle and decedent likewise took a position on the rear bumper on the left side. The bumper was a small one and the handhold consisted of a small water gutter on the top of the cab, described as "not much of a place to hold on". Baltzell had mud on his shoes and decedent may also have had mud on his. There was room inside the vehicle for all to ride and no one was told to ride on the outside. None of the employees had ever ridden on the bumper of the Scout before. Stan drove the vehicle from the field onto a country road. The road was dirt, straight with a level surface and at the time of the accident was smooth and without ruts or rough spots. Stan had shifted through the first two gears and was in third gear traveling from twenty to twenty-five miles per hour. The vehicle had traveled about 472 feet when Doyle Kirby fell off. The only eyewitness, Jim Baltzell, testified that "out of the corner of his eye he caught Doyle going over. He started hollering and watched Doyle hit. It looked to [him] like Doyle was trying to catch his balance and all of a sudden his body just turned and he went down". Immediately prior to the fall Stan was driving in a smooth manner; no rough spots were felt and there was no veering, lurch or jerk or any other unusual movement in the vehicle. The accident occurred about 9:30 a. m.

Decedent lay curled upon the roadway. There were cuts and abrasions on his head but there was no bleeding. He was vomiting. Jim Kibel went to notify his mother and decedent's wife, who lived on the ranch. The other three employees tried several times to put Kirby into the vehicle to take him to town but Kirby insisted they leave him alone and he would be all right. Upon the arrival of Mrs. Kibel and Mrs. Kirby upon the scene further efforts were made to put decedent in the vehicle but he again insisted he should be left alone and it was agreed that should be done. Mrs. Kibel and Mrs. Kirby then went to the Baltzell residence where Mrs. Kibel attempted to locate her husband by telephone. Mr. Kibel, the foreman, arrived at the scene of the accident and directed that an ambulance be summoned from Goodland. This call was received at the Goodland hospital at 10:55 a. m. The ambulance driver, who had had training as such and was also a licensed practical nurse, arrived at the scene where he found Kirby lying on the road in a confused and disoriented state. When he touched Kirby the latter thrashed about and objected to being moved. Nonetheless the

driver loaded Kirby into the ambulance and took him to the Goodland hospital, arriving about 11:40 a. m.

A general medical practitioner there examined Kirby in the emergency room at about 12:00 noon. His initial impression was that Kirby had sustained a brain concussion. Kirby was admitted to the hospital for observation. At about 12:30 or 12:45 p. m. symptoms of more sever damage appeared. There were changes in blood pressure and Kirby's right pupil became widely dilated. As his condition continued to deteriorate signs of a basilar skull fracture appeared and arrangements were made to transfer him to another hospital.

Kirby was flown to a Denver hospital where he was initially examined by a neurosurgeon at 4:15 p. m. of the same day. It was necessary to place an endotracheal tube to aid Kirby's breathing. His left pupil also became widely dilated and fixed. Hypertonic solutions were administered to decrease the swelling in the brain which resulted in the left pupil again becoming small. Pressure on the brain, most likely a blood clot, was diagnosed and Kirby was taken to surgery. The operation revealed a large skull fracture. Drainage holes were placed in the skull. A good sized subdural blood clot was removed. Kirby remained comatose following the operation. A tracheotomy was performed to aid breathing. On August 25, 1971, Kirby died of pneumonitis; however, the skull fracture was the real cause of death.

Further evidence will be narrated in connection with discussion of the points on appeal.

The bases of appellants' claim for relief essentially are that Stan Kibel negligently operated the vehicle in question and appellees are thereby responsible to them by reason of K. S. A. 8-222 which provides that the owner of a motor vehicle who knowingly permits a minor under the age of sixteen years to operate the vehicle upon a highway shall be jointy liable for damages caused by the negligence of the minor in driving the vehicle; that appellees failed to furnish decedent a safe place to work; and failed to furnish proper medical care after they knew or should have known of his injury.

Appellants assert two trial errors which should be noted prior to consideration of the sufficiency of the evidence. The first relates to exclusion of an exhibit offered by them, an accident report made out by Art Kibel, appellees' foreman, in which he stated he was the driver of the Scout at the time of the fatal accident. The exhibit was excluded on the ground it was not the best evidence. The

instrument might well have been admitted; however, any error is nonprejudicial. Art Kibel admitted on the witness stand he told the sheriff he was driver of the Scout and that he did not list on the accident report the fact his son Stan was the driver at the time of the injury. He did this to protect his son but everyone present including Mrs. Kirby and Kirby's stepfather knew the day of the accident that Stan was the driver. The sheriff likewise testified Kibel stated to him orally and in his accident report that he, Kibel, was the driver of the Scout. The evidence excluded was of a cumulative nature on an uncontroverted matter collateral to the issues of liability and its exclusion is not sufficient ground for the granting of new trial.

Appellants also complain of the trial court's rulings relative to alleged juror misconduct. New trial was sought on this ground in the widow's case, the request being supported by a proffered affidavit of one juror and proffered testimony of two others wherein it was alleged a juror had revealed prejudice against appellants by certain remarks made by her during the course of the jury's deliberation. The trial court declined to consider the affidavit or the testimony in the light of its ruling granting judgment to appellees notwithstanding the verdict.

A party who has moved for a directed verdict may move to have the verdict set aside and to have judgment entered in accordance with his motion for directed verdict (K. S. A. 60-250 [b]). This is the procedure followed here. Appellees urge that if the court properly entered judgment for them notwithstanding the verdict then any alleged jury misconduct becomes immaterial. We have so held in a comparable situation. In *Anderson v. Cooper,* 192 Kan. 723, 391 P. 2d 86, the jury had returned a general verdict for the defendant in a tort action. At the hearing of motion for new trial the trial court found that the jury had been guilty of misconduct. However, it reversed its earlier decisions overruling defendant's demurrer to plaintiff's evidence and his motion for directed verdict and it rendered judgment in favor of the defendant. The trial court ruled that the issue of jury misconduct had become moot. This court affirmed, saying:

"[I]f the trial court correctly determined that a demurrer should have been sustained to plaintiff's evidence, or if it should have entered a directed verdict, the question of the jury's misconduct becomes immaterial." (p. 726.)

The same rule is applicable to a motion under K. S. A. 60-250 (b).

We pass to the other issues raised. As indicated the trial court found that no negligence on the part of appellees contributed to the decedent's injuries and death and it also found the decedent assumed the risk and was guilty of contributory negligence. Accordingly, the court entered judgement for appellees. In ruling on a motion for directed verdict the oft-repeated rule is that the court must consider all the evidence and the inferences that can reasonably be drawn therefrom in the light most favorable to the party against whom the motion is directed, and if reasonable minds could reach different conclusions from the evidence and inferences the motion must be overruled.

In *Kleppe v. Prawl,* 181 Kan. 590, 313 P. 2d 227, 63 ALR 2d 175, we discussed the distinction between assumption of the risk and contributory negligence as follows:

"While assumption of risk is somewhat akin to contributory negligence, these two doctrines of law are not synonymous because assumption of risk arises through implied contract of assuming the risk of a known danger; the essence of it is venturousness; it implies intentional exposure to a known danger; it embraces a mental state of willingness; it pertains to the preliminary conduct of getting into a dangerous employment or relation; it means voluntarily incurring the risk of an accident, which may not occur, and which the person assuming the risk may be careful to avoid; it defeats recovery because it is a previous abandonment of the right to complain if an accident occurs. Contributory negligence arises out of a tort; the essence of it is carelessness; it may or may not imply intentional exposure to a known danger; it is a matter of conduct; a contributorily negligent act leads more immediately to a specific accident. Another difference is that assumption of risk denies defendant's negligence while contributory negligence admits defendant's negligence but denies it is the proximate cause of the accident." (p. 594.)

Here there was no evidence of any negligence on the part of the driver of the Scout so as to render appellees liable under K. S. A. 8-222 (see *Jacobs v. Hobson,* 148 Kan. 107, 79 P. 2d 861) unless it could be said that driving between twenty and twenty-five miles per hour constituted such negligence. Assuming that the reasonableness of the speed under the circumstances presented a jury question, was the decedent guilty of contributory negligence as a matter of law? Under the undisputed evidence this question must be answered in the affirmative. Decedent was furnished a safe place to work— there was room inside the vehicle for him to ride. He had been reared on a farm and was an experienced farm worker. He was familiar with the vehicle being used and knew it had no satisfactory hand hold to grasp while riding outside. Yet he voluntarily chose to

ride outside in a position which the ordinary person would realize posed danger. In fact the whole danger of a fall from the vehicle while it was traveling at the speed in question derived from his standing in a position where he would be unable to hold onto the vehicle in order to maintain his balance while the vehicle was in motion. We think the trial court properly ruled the decedent was guilty of contributory negligence in attempting to ride as he did.

Appellants make the further contention appellees failed to furnish proper medical care after they knew or should have known of decedent's injury. The argument is appellees were derelict in permitting him to lie on the road over an hour before an ambulance was summoned. The accident occurred about 9:30 a. m. An ambulance was summoned from Goodland at 10:55 a. m. Meanwhile decedent's fellow employees attempted several times while decedent remained conscious to place him in the Scout vehicle for transportation into town. Decedent resisted, saying they should leave him alone and he would be all right. Word was sent immediately to foreman Kibel's house and his wife thereupon attempted to locate him. She and decedent's wife came to the scene. There decedent again resisted efforts to place him in Mrs. Kibel's car and his wife agreed he should be left alone. The foreman's wife and Mrs. Kirby went to a nearby residence where there was a phone. Mrs. Kirby did not telephone for an ambulance. She gave as her reason for not phoning the fact she hadn't asked permission to use the phone. (She did testify she asked Mrs. Kibel to call an ambulance—Mrs. Kibel disputed this, which is about the only controverted fact in the case). As soon as the foreman arrived he immediately had an ambulance called. Decedent did receive medical attention at noon and special care later that afternoon at the Denver hospital. Whether earlier medical attention would have prevented his death was highly conjectural at best. The Goodland doctor testified that if he had seen decedent right after the accident his treatment would have been the same; he would have simply kept him in the hospital for close observation to see if the various localizing fractures appeared. In his opinion it really made no difference when Kirby came into the hospital because the symptoms of severe head injury did not begin to appear until about 12:30 p. m. The doctor also testified it is normal for a person who "bangs his head" and has brain concussion and is semi-conscious to tell people to leave him alone and that he will be O. K. in a few minutes; it is also normal for the people

around the injured person to follow his directions. The Denver neurosurgeon testified that possibly the earlier removal of the blood clot could have prevented some of the later damage but "whether or not an hour at that point would have made a lot of difference is strictly hypothetical". This doctor also stated he was afraid the decedent had sustained a rather fatal injury from the beginning and the doctors' efforts were somewhat in vain.

Upon this state of the record we cannot say appellees were negligent in failing to provide proper medical care. Such resources as were immediately available toward procuring medical aid were continuously rebuffed by decedent with the apparent agreement of his wife—a normal and natural reaction for lay persons. Medical care was thereafter furnished within a reasonable time under the circumstances. We think no breach of duty was shown and the trial court properly entered judgment for appellees.

The judgment is affirmed.

APPROVED BY THE COURT.